1
2
3
4
5
6
7
8
9

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA**

10

| | | |
|---|---|---|
| **MICHAEL J. BRADFORD,** | ) | No. 1:06-CV-01214 AWI GSA |
| | ) | |
| **Plaintiff,** | ) | **ORDER RE: DEFENDANTS'** |
| | ) | **MOTION FOR SUMMARY** |
| **v.** | ) | **JUDGMENT** |
| | ) | |
| **CITY OF MODESTO, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

11
12
13
14
15
16
17

**I. History**[1]

18     In 2004, Plaintiff Michael J. Bradford was investigated by the Modesto Police

19 Department for armed robbery and assault.  On June 29, 2004, Plaintiff met with Juan Moreno, a

20 confidential informant who was wearing an audio recording device, in a house in Riverbank; the

21 Police listened in on their conversation as it was taking place.[2]  Plaintiff admitted to committing

22 a series of armed robberies.  He then said that he was not currently armed, but was planning to

23 commit another armed robbery that night.  Further, he indicated that he would likely resist arrest

24 if confronted by police.

25

26     [1]The factual history is provided for background only and does not form the basis of the
court's decision; the assertions contained therein are not taken as adjudged to be true.  The
legally key facts the court relies upon are discussed within the analysis.

27

28     [2]The content of the conversation is disputed by the parties; the court presents the
Defendants' version here for background.

At an unspecified time in the evening, Plaintiff left the location as a passenger in a car driven by Rebecca Ingham.  The police officers monitoring the conversation decided to arrest Plaintiff.  They tried to pull the car over, but instead of stopping, the car tried to evade the police.  The car stopped in a residential area whereupon Plaintiff exited the vehicle and jumped over a fence into a nearby yard.  The police formed a cordon and began to search through the yards on that block.

After an unspecified amount of time, Defendant Officers Robert Hart, Carlos Ramirez, and David Ramirez ("Police Defendants") came upon the yard in which Plaintiff was hiding.[3]  Before entering, they announced that they were sending in a police dog into the yard.  The dog went in, presumably found nothing, and returned to the Police Defendants.  They entered the yard, separating to search different parts.  Defendant Hart then saw Plaintiff near the fence and called out his discovery.  Defendants C. Ramirez and D. Ramirez began moving towards Defendant Hart.  Plaintiff's hands were empty.  Defendant Hart ordered Plaintiff to show his hands.  Plaintiff did not comply.  Defendant Hart told Plaintiff "don't do it" a couple of times.  Defendant C. Ramirez was next to Defendant Hart and he ordered Plaintiff to show his hands and get onto the ground.  Plaintiff moved his hands toward his waistband.  Defendant Hart fired his gun twice.  Defendant C. Ramirez heard the shots and thought Plaintiff was shooting at them.  Defendant C. Ramirez then fired his gun at Plaintiff an unspecified number of times.  In doing so, he fell down.  Defendant Hart heard the shooting and saw Defendant C. Ramirez fall and thought Plaintiff had shot Defendant C. Ramirez.  Defendant Hart continued to shoot at Plaintiff.  Defendant D. Ramirez, who was standing a little apart from the other two, heard two gunshots and saw Defendant C. Ramirez fall down.  He thought Plaintiff was shooting at Defendants Hart and C. Ramirez and fired his gun at Plaintiff.  He took ahold of Defendant C. Ramirez to help pull him away from Plaintiff.  At some point during all of this, Plaintiff was shot once and fell to

---

[3]The actions that took place in the yard are disputed by the parties; the court presents the Defendants' version here for background.

2

the ground.  He was then shot a second time while on the ground.[4]  The parties have not specified which of the Police Defendant(s) shot Plaintiff.  Plaintiff was then arrested.

Plaintiff was charged in federal court on twelve counts in relation to various armed robberies.  He plead guilty to two counts of 18 U.S.C. §924 (use of a firearm in relation to a crime of violence), with the others being dismissed.  On June 27, 2006, Plaintiff filed suit in state court against the Police Defendants and the City of Modesto.  The suit lists eight state law causes of action and three causes of action under 42 U.S.C. §1983.  Defendants removed the case to federal court on September 6, 2006.  Plaintiff was originally represented by counsel in this civil suit.  On June 3, 2008, his counsel moved to withdraw from the case; Plaintiff filed a declaration agreeing to the withdrawal, indicating his decision to represent himself in this matter.  Meanwhile, Defendants filed the present motion for summary judgment on June 19, 2008.  The court granted Plaintiff's counsel's motion to withdraw on July 3, 2008.  Proceeding pro se, Plaintiff filed an opposition that did not address Defendants' statement of undisputed facts.  Nevertheless, Plaintiff did present evidence to dispute key facts.  Notwithstanding the noncompliance with local rules, Plaintiff has provided sufficient material for resolution of the motion.

## II. Legal Standards

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying the portions of the declarations (if any), pleadings, and  discovery that demonstrate an

---

[4]This is one possible scenario derived from Defendants' declarations.  However, there are inconsistencies as to the order of events, especially as to the order of firing.  Again, the purpose of this factual history is for background only.

absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it might affect the outcome of the suit under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings Assn, 322 F.3d 1039, 1046 (9th Cir. 2002).  A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim. See James River Ins. Co. v. Schenk, P.C., 519 F.3d 917, 925 (9th Cir. 2008).  If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion." Nissan Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'" Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing

4

party. See <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986); <u>Stegall v. Citadel Broad,</u>

<u>Inc.</u>, 350 F.3d 1061, 1065 (9th Cir. 2003). Nevertheless, inferences are not drawn out of the air,

and it is the opposing party's obligation to produce a factual predicate from which the inference

may be drawn. See <u>Juell v. Forest Pharms., Inc.</u>, 456 F.Supp.2d 1141, 1149 (E.D. Cal. 2006);

<u>UMG Recordings, Inc. v. Sinnott</u>, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004). "A genuine issue of

material fact does not spring into being simply because a litigant claims that one exists or

promises to produce admissible evidence at trial." <u>Del Carmen Guadalupe v. Agosto</u>, 299 F.3d

15, 23 (1st Cir. 2002); see <u>Galen v. County of Los Angeles</u>, 477 F.3d 652, 658 (9th Cir. 2007);

<u>Bryant v. Adventist Health System/West</u>, 289 F.3d 1162, 1167 (9th Cir. 2002). Further, a

"motion for summary judgment may not be defeated ...by evidence that is 'merely colorable' or

'is not significantly probative.'" <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986);

<u>Hardage v. CBS Broad. Inc.</u>, 427 F.3d 1177, 1183 (9th Cir. 2006). Additionally, the court has

the discretion in appropriate circumstances to consider materials that are not properly brought to

its attention, but the court is not required to examine the entire file for evidence establishing a

genuine issue of material fact where the evidence is not set forth in the opposing papers with

adequate references. See <u>Southern Cal. Gas Co. v. City of Santa Ana</u>, 336 F.3d 885, 889 (9th Cir.

2003). If the nonmoving party fails to produce evidence sufficient to create a genuine issue of

material fact, the moving party is entitled to summary judgment. See <u>Nissan Fire & Marine Ins.</u>

<u>Co. v. Fritz Companies</u>, 210 F.3d 1099, 1103 (9th Cir. 2000).

### III. Statement of Undisputed Material Facts[5]

1. The instant action arises from an incident which occurred on June 29, 2004.

2. On the date of this incident, the plaintiff, Michael Bradford, was the named suspect in an

---

[5]This is a list of Defendants' facts. Plaintiff does not directly address them, instead providing a declaration that presents an alternate narrative of events. These facts are not taken as adjudged to be true. The relevant facts are discussed in the narrative.

ongoing investigation in which the plaintiff, who was a known ranking member in the Norteno criminal street gang, was a named suspect in a recent assault with a deadly weapon, as well as the named suspect in a string of armed robberies in the Modesto area, in which a handgun was displayed to the victims.

3. During a meeting between the plaintiff and a confidential informant at a residence in Riverbank, California, the plaintiff's conversation with the informant was monitored by electronic means facilitated by a monitoring device which was worn by the informant which broadcast the conversation to a radio monitor manned by the police.  Information regarding the plaintiff's statements made during that conversation were relayed to officers participating in the surveillance.

4. During the monitored conversation with the confidential informant, the plaintiff stated that he went about on the street armed with a firearm, that he was not armed at moment, that he was the perpetrator of the armed robberies which were then under investigation, and that he intended to commit another armed robbery on the night of this conversation, using his "beanie" and his "strap," which were street slang for the distinctive cap which the robbery suspect wore in the crimes under investigation and for a handgun.

5. During the monitored conversation with the confidential informant, plaintiff Bradford told the informant that, if he were confronted by law enforcement, he would resist arrest by using his "strap," which is street slang for a handgun.

6. The defendant officers were aware that the prior robberies for which Mr. Bradford was then wanted, and which he had admitted to having committed, had involved his actual display of a firearm to the victims.

6

7. After the conclusion of the monitored conversation with the confidential informant, Mr. Bradford was observed as a passenger in a vehicle which left the residence.

8. At that time, the investigating officers believed that, based upon his statement during the monitored conversation, Mr. Bradford was then about to make good on his stated plan of committing another robbery.

9. Under those circumstances, it was then the investigating officers' belief that, if Mr. Bradford had, indeed, been unarmed while inside the residence, he would have armed himself once he entered the car and left to do the planned robbery.

10. Based upon the information then available to the investigative team, the decision was made to arrest Mr. Bradford immediately, so as to prevent yet another armed robbery.

11. Under the circumstances, the officers who would be participating in this arrest effort believed that they were engaged in an effort to apprehend an armed and dangerous felon, since this was a situation which involved the arrest of a self-proclaimed armed man who was a wanted felon and who had stated that he planned to violently resist arrest.

12. Based upon the information then available to them, and upon their training and experience as police officers, it was the defendant officers' belief that they needed to be on a heightened state of alert to the danger of armed violence by the suspect in effecting this arrest, and they were.

13. At the direction of the incident supervisor, a marked police car was maneuvered into position in order to conduct a stop on the vehicle carrying Mr. Bradford.  When the attempt to make that stop was initiated, the Bradford vehicle fled instead of yielding.

14. As to that moment, Mr. Bradford and his driver/accomplice were actively resisting the law enforcement attempt to effect the arrest of Mr. Bradford, and the danger to the arresting officers which was posed by the unfolding situation was further escalated.

15. A vehicle pursuit on primarily residential surface streets ensued, and, when the Bradford vehicle finally yielded, Mr. Bradford immediately jumped out of the vehicle, jumped over the fence of a nearby residential lot, and disappeared from the view of the pursuing officers.

16. This continued resistance to arrest by a man who was believed to be an armed and wanted felon, coupled with the fact that he now had a tactical advantage (due to the fact that he was now concealed within a residential neighborhood in low light nighttime conditions), escalated the danger for the officers trying to capture him to extreme heights.

17. The neighborhood was cordoned off in an effort to secure the area, and two search parties were organized, so as to conduct simultaneous yard-to-yard searches of the properties on the block into which Mr. Bradford had disappeared.

18. Defendant Officer Hart was the K-9 officer who was assigned to one of those teams, to which defendant Officers D. Ramirez and C. Ramirez also belonged.  In advance of the entry of the team's officers into each yard which was about to be searched, he made a loud announcement which informed anyone in the yard that the police were about to enter, and that a police dog would be released into the yard.  This announcement was made for the purpose of warning anyone inside the yard, in order to allow any such person to identify himself and surrender, so as not to be bitten by the dog upon its release. When that announcement was made into the yard where Mr. Bradford was found, he did not respond.

19. Officer Hart's dog was sent into the yard to search it, and a few moments after he went out of sight around the rear corner of the house, he returned without having alerted.  The search team then entered the yard and commenced to search it.

20. There was a free-standing shed in the rear corner of the back yard, and Officer Hart and part of the team went to clear the shed and the area behind it.  After "clearing" the area between the shed and the fence, Officer Hart turned away from that area, at which time he saw Mr. Bradford standing near the fence at the front end of the backyard.  It appeared that he was preparing to jump over the fence into the next yard.

21. Mr. Bradford looked at Officer Hart, and, at that moment, Hart could see both of his hands, which were empty.  Rather than either jump the fence or surrender, he stood looking at Officer Hart, and then, after a momentary delay, he brought one of his hands to his waistband in a motion which appeared to Officer Hart to be a reach for a handgun.

22. Officer Hart ordered Mr. Bradford to show his hands, and he stopped moving with his hand at his waistband, and stood staring at the officer.

23. Officer Hart repeated the order for Mr. Bradford to show his hands, and he did not comply. Based upon the way in which Mr. Bradford was looking at him, and because he thought that Bradford was about to draw a weapon from his waistband, instead of complying with his order to show his hands, Officer Hart told him "don't do it" a couple of times.

24. Mr. Bradford then suddenly moved the hand that was at his waistband, and, believing that he was in the act of drawing to fire on him, Officer Hart fired his handgun at Bradford twice. Officer Hart then became aware of Officer Carlos Ramirez' presence near him, heard other

9

gunshots, then saw Officer Ramirez fall to the ground.

25. As the search team entered the rear yard of the property where Mr. Bradford was found, it broke into two elements, and Officer David Ramirez moved to the southeast corner of the house, while Officer Carlos Ramirez and others cleared a free-standing shed along the east fence line of the back yard.  Moments later, as the officers moved to search the east side yard, Officer David Ramirez heard someone call out that he saw Bradford.

26. Officer David Ramirez heard an officer repeatedly say "Let me see your hands."  He then heard the sound of two gunshots, and then saw Officer Carlos Ramirez take a step backward and fall to the ground.

27. Officer Carlos Ramirez was one of the officers who had "cleared" the shed in the back yard with Officer Hart.  He heard Officer Hart call out that he saw Bradford, and, when he looked in that direction, he saw mr. Bradford standing near the front fence near the corner of the yard.

28. Officer Carlos Ramirez saw that Mr. Bradford was turned toward Officer Hart, and that, after staring at Hart for a time, he brought one of his hands to his waistband in a motion which appeared to be a reach for a handgun.  Officer Hart ordered Bradford to show his hand, and he stopped moving with his hands at his waistband, and stood staring at Hart.  Officer Carlos Ramirez moved toward Officer Hart's position, and began to repeatedly order him to show his hands and get onto the ground.

29. Mr. Bradford did not comply with the commands which the officers were giving.  An officer told Bradford "don't do it" a couple of times, and Mr. Bradford then suddenly moved the hand that was at his waistband.  At that moment, Officer Carlos Ramirez heard gunshots, and

believing that Bradford was engaging officers in a firefight, he fired his rifle in Bradford's direction from the supine position as he attempted to scoot to a position of cover.

31. After observing Officer Carlos Ramirez fall to the ground, and believing that Officer Ramirez had been shot by Mr. Bradford, Officer Hart fired his handgun in the direction of Mr. Bradford again, intending to provide cover fire for other officers whom he expected would be moving forward to rescue Officer Ramirez

32. After seeing Officer Carlos Ramirez take a step backward and fall to the ground, Officer David Ramirez believed that Carlos Ramirez had been shot by Bradford, and that Bradford was making good on his boast that he's fight it out with arresting officers.  He then moved out into the open in order to try to grab Carlos Ramirez in order to drag him to safety.  As he did so, he saw Bradford squatting down behind some kind of object, as if to take cover behind it.  He raised his duty sidearm and fired on Bradford in order to get his head down, so that he could try to extract Carlos Ramirez from the "kill zone."

33. Officer David Ramirez heard some other gunfire and thought that some or all of it might be coming from Bradford.  As a result, he pulled back momentarily, then re-entered the "kill zone," in another attempt to extract Carlos Ramirez.  As he did so, he fired two more rounds in Bradford's direction.  As this was going on, Officers Freudenthal and David Ramirez collided with one another, and Carlos Ramirezwas able to crawl out of the "kill zone" on his own.

34. Once Carlos Ramirez was out of the "kill zone," all officers pulled back from the corner of the house and waited until a shield was brought into the back yard.  Mr. Bradshaw said that he had been shot, and, once the shield was brought in, officers used it to facilitate and approach to where Mr. Bradford had fallen to the ground.  At that point, Bradford was taken into custody.  No

shots were fired during that activity.

35. Plaintiff Michael Bradford has filed no tort claim with the City of Modesto regarding the incident of June 29, 2004, which gives rise to this action, nor has he filed any petition for leave to file a late tort claim.

36. Modesto Police Department has in place policies and procedures for the investigation of citizen complaints of officer misconduct in the performance of duty which fully comply with the provisions of California Penal Code section 832.5, and case law interpreting that section.

37. Every complaint of officer misconduct is promptly and thoroughly investigated by a trained internal affairs investigator.

38. Every completed internal affairs investigation is thoroughly reviewed by the Department's command staff, which makes recommendations, and ultimately, by the Chief of Police, who makes the ultimate determination of whether any officer has engaged in wrongdoing, and decides upon the appropriate corrective action, if any, which is to be taken.

39. Modesto Police Department has in place policies and procedures for the training and supervision of its peace officer employees which fully comply with the standards set by the California Commission for Peace Officer Standards and Training (P.O.S.T.), which affect the police service, and regularly consults with attorneys from the Office of the City Attorney to ensure that departmental policy responds to changes in the law promptly as they may occur.

41. The policies of the Modesto Police Department are drafted so as to ensure that police business is conducted in strict compliance with the requirements of the Constitutions of the

United States of America, and the State of California, respectively, as well as with the statutory and decisional law of those entities are regularly reviewed by department staff, and are updated, as necessary, so as to keep them current with the requirements of law and the highest standards of police service.

42. As an additional step in ensuring that Modesto Police Department's policies and procedures are maintained to the highest standards, the City of Modesto and the Modesto Police Department have, since 2005, obtained and maintained the accreditation of the Police Department from the Commission of Accreditation of Law Enforcement Agencies (CALEA), a nationwide sanctioning authority sponsored by the major national law enforcement executive associations.

43. In order to be accredited by CALEA, a law enforcement agency's policies must meet the criteria set by that sactioning body, which was formed for the express purpose of setting and maintaining high standards for its member law enforcement agencies, in order to ensure that police service is provided to the citizenry in a professional manner, and in accordance with the principles embodied in the Unites States Constitution.

44. The training which is provided to the officers of the Modesto Police Department, both at the police academy level, and during regular in-service training which is approved by the California Commission on Peace Officer Standards and Training (P.O.S.T.).  As such, this training comports with the standards set by the State of California for the peace officers of the state.

45. Consistent with California state law, every officer employed by Modesto Police Department must successfully complete a P.O.S.T. accredited police academy before being placed in service as a peace officer.

13

46. Furthermore, every officer employed by the Modesto Police Department receives annual in-service training which meets P.O.S.T. requirements for annual advanced officer training, so as to maintain each officer's proficiency in critical areas of the police service.

47. In addition, officers of the Modesto Police Department are encouraged to attend specialized training from P.O.S.T. approved training providers in addition to the annual in-service training which is provided by the Department.

### IV. Discussion

**A. Plaintiff's Declaration**

Defendants seek to have Plaintiff's declaration rejected by the court in its entirety for being submitted in bad faith within the meaning of Fed. R. Civ. Proc. 56(g). Doc. 39, Defendants' Reply, at 5:10-14. Plaintiff states "I did not, before this incident or at any other time commit, a[n] assault with a deadly weapon or assault with a firearm on any person." Doc. 34, Plaintiff's Declaration, at 7. Defendants argue the statement is directly contradicted by Plaintiff's prior guilty plea to two counts of using a firearm during a crime of violence in violation of 18 U.S.C. §924(c)(1). At Defendants' request, the court takes judicial notice of the filings in that criminal case. Doc. 39, Defendants' Reply, at 4:17-19. Of note, the factual basis for the plea agreement reads:

> On June 19, 2004, at 2:30 a.m., the defendant robbed the 7-11 Store at 1045 Oakdale Road in Modesto, California. The defendant used a small black handgun and demanded money. The robber was described by the victim clerk as a tall, thin white male wearing a black beanie cap, black jersey with the number 5 on it, and black pants. The defendant took $170 in cash from the store's cash register and fled....
>
> On June 21, 2004, at 10:30 p.m., the defendant robbed the Blockbuster Video Store at 2210 Patterson Road in Riverbank, California. The defendant used a small black revolver and demanded money. The robber was described by the victim clerk as a tall, thin white male wearing a black beanie cap, FUBU jersey with the number 5 on it, and black gloves. The defendant took $130 in cash from the store's cash register and fled.

Crim Case No. 04-5288, Doc. 26, Plea Agreement, at 11. In the original indictment, counts nine

14

through twelve dealt with these two incidents.  Plaintiff was initially charged with "physically intimidat[ing] the employee[s] with a handgun and demand[ing] that the employee[s] hand over money from the cash register and business" under 18 U.S.C. §1951(a) and brandishing the firearm under 18 U.S.C. §924(c)(1). Crim. Case No. 04-5288, Doc. 1, Indictment, at 7:1-9:21. As part of the plea, these charges were dropped and Plaintiff plead guilty to using a firearm under 18 U.S.C. §924(c)(1) which carries a lesser penalty than brandishing.  The statute does not give a definition for "using," but the term "brandishing" is defined as "with respect to a firearm, to display all or part of the firearm, or otherwise make the presence of the firearm known to another person, in order to intimidate that person, regardless of whether the firearm is directly visible to that person." 18 U.S.C. §924(c)(4).  "Discharging" the firearm (which Plaintiff was not charged with) is yet another distinct act which carries a heavier penalty under 18 U.S.C. §924(c)(1).

A definition of "assault with dangerous or deadly weapon" is "an unlawful attempt or offer to do bodily harm without justification or excuse by use of any instrument calculated to do harm or cause death. An aggravated form of assault as distinguished from a simple assault; e.g. pointing loaded gun at one is an assault with dangerous weapon." Black's Law Dictionary, 115 (6th ed. 1990).  Relevant to the situation at hand, a conviction for assault with a dangerous weapon under 18 U.S.C. §113(a)(3) must be supported by the following elements:

> First, the defendant intentionally [struck or wounded [victim]] [used a display of force that reasonably caused [victim] to fear immediate bodily harm];
>
> Second, the defendant acted with the specific intent to do bodily harm to [victim]; and
>
> Third, the defendant used a [weapon].
>
> [A [weapon] is a dangerous weapon if it is used in a way that is capable of causing death or serious bodily injury.]

Ninth Circuit Criminal Jury Instructions, 8.5 (2003).

So, Plaintiff admitted to "using" a firearm without either "brandishing" it or "discharging" it within the meaning of 18 U.S.C. §924.  The crime he admitted to may or may not qualify as an assault with a deadly weapon.  Defendants state that Plaintiff "was a suspect in

15

seven (7) recent armed robberies and a separate assault with a firearm." Doc. 25, Defendants'

Brief, at 4:19-20.  As far as can be determined, Plaintiff was not convicted of armed robbery or

assault with a firearm.  In context, Plaintiff's statement appears to be an emphasis of the point

that he was not convicted of those crimes.  Thus, the court can not say as a matter of law that

Plaintiffs' statement is demonstrably false.  In summary judgment, the court does not make

credibility assessments.  When opposing parties submit evidence that contradicts each other, the

fact is disputed for purposes of summary judgment.  Plaintiff's assertions contained in his

declaration must be considered in determining what facts are disputed.


**B. State Law Causes of Action**

       In the complaint, Plaintiff causes of action include (1) assault and battery; (2) excessive

force; (3) violation of Article I, Section 7 of the California Constitution; (4) violation of Article I,

Section 17 of the California Constitution; (5) intentional infliction of emotional distress; (6)

negligence; (7) negligent hiring and retention, and (10) violation of Article I, Section 13 of the

California Constitution against Defendants.  Initially, Plaintiff alleged that he "has complied with

the Governmental Entity claim filing procedures and requirements as set forth in California

Government Code §945, et seq." Doc. 2, Ex. A, Complaint at 3:13-14.  Defendants submit the

declaration of Stephanie Lopez, City Clerk of the City of Modesto, who states

              3. In my capacity as City Clerk, my duties include the oversight of the City's tort
       claims records. As a result, I am familiar with those records and how they are kept.
              4. Every tort claim which is served upon the City of Modesto is maintained in a
       file discreet [sic] to that claim, and all documents which are generated or received by the
       Office of the City Clerk in connection with that claim are added to and maintained in the
       file for that claim.
              5. At the request of the Office of the City Attorney, I examined the tort claim files
       of the City in search of any record of a tort claim filed by or on behalf of one Michael
       Bradford regarding an incident which occurred on or about June 29, 2004.
              6. A thorough search of the tort claims records revealed that there is no record on
       file with the City of Modesto of any such tort claim, nor has any application every been
       filed by or on behalf of Michael Bradford for leave to file a late claim.

Doc. 25, Part 4, Lopez Declaration, at 19:7-17.  Plaintiff has not addressed this issue in

opposition.

The California Tort Claims Act generally states that no suit for money damages can be brought against a public entity unless a claim was presented to the public agency. "There shall be presented in accordance with Chapter 1 (commencing with Section 900) and Chapter 2 (commencing with Section 910) all claims for money or damages against local public entities except..." Cal. Gov't Code §905. "Except as provided in Sections 946.4 and 946.6, no suit for money or damages may be brought against a public entity on a cause of action for which a claim is required to be presented in accordance with Chapter 1 (commencing with Section 900) and Chapter 2 (commencing with Section 910) of Part 3 of this division until a written claim therefor has been presented to the public entity and has been acted upon by the board, or has been deemed to have been rejected by the board, in accordance with Chapters 1 and 2 of Part 3 of this division." Cal. Gov't Code §945.4 (West 1995). This requirement similarly applies to public employees acting within the scope of their duties. "Except as provided in Section 950.4, a cause of action against a public employee or former public employee for injury resulting from an act or omission in the scope of his employment as a public employee is barred if an action against the employing public entity for such injury is barred under Part 3 (commencing with Section 900) of this division or under Chapter 2 (commencing with Section 945) of Part 4 of this division. This section is applicable even though the public entity is immune from liability for the injury." Cal. Gov't Code §950.2. This section "makes it clear that suit against a public employee or former employee is barred when a suit against the entity is barred (1) by failure to present any claim at all or (2) by presenting a claim that is insufficient, too late or for any other reason inadequate to support an action against the employing public entity." Cal. Gov't Code §950.2 (West 1995), Law Revision Commission Comment to 1965 Amendment. This appears to apply to public employees who are being sued in their individual capacity. See Cotterill v. City & County of San Francisco, 2008 U.S. Dist. LEXIS 63122, *12-13 (N.D. Cal. Aug. 19, 2008); Henson v. Lassen County, 2006 U.S. Dist. LEXIS 50386, *51 (E.D. Cal. July 20, 2006). "[T]he filing of a claim

17

for damages 'is more than a procedural requirement, it is a condition precedent to plaintiff's maintaining an action against defendants, in short, an integral part of plaintiff's cause of action.'" Williams v. Horvath, 16 Cal. 3d 834, 842 (Cal. 1976), quoting Illerbrun v. Conrad, 216 Cal.App.2d 521, 524 (Cal. Ct. App. 1963).

Plaintiff's state law causes of action require a presentation of claim prior to suit; the causes of action do not fall under any exception. Plaintiff's causes of action against Police Defendants are based on actions within the scope of their employment as police officers. Defendants have presented the declaration of the City Clerk, who affirms that Defendant Modesto has received no tort claim. Plaintiff's bare allegation that he has complied with Cal. Gov't Code §945 et seq. is insufficient at this stage. Summary judgment in favor of Defendants for Plaintiff's state law causes of action (1, 2, 3, 4, 5, 6, 7, and 10) must be granted.

**C. Excessive Force**

Plaintiff's eighth cause of action alleges deprivation of Fourteenth Amendment rights based on due process and "the right to be free from pain and suffering" while his ninth cause of action alleges unjustified use of force in violation of Fourth Amendment rights. Doc. 2, Part 2, Complaint, at 9:13-10:12. All claims that police officers used excessive force, either deadly or non-deadly, in the course of an arrest, investigatory stop, or other seizure are analyzed under the Fourth Amendment and its standard of objective reasonableness. Graham v. Connor, 490 U.S. 386, 395 (1989). Both of these causes of action are, at base, excessive force claims under 42 U.S.C. §1983. Thus the court understands the two to be duplicative.

Defendants assert that (1) Police Defendants used appropriate force in apprehending Plaintiff on June 29, 2004 and (2) even if excessive force was used, qualified immunity applies. Plaintiff, pursuing this case pro se, does not address Defendants' legal assertions, but provides his own declaration which contradicts the declarations of Police Defendants regarding the events

1    of June 29, 2004.[6]

2

3    **1. Factual Circumstances Surrounding the Shooting**

4          Both parties agree that Plaintiff was meeting with Juan Moreno.  Defendants provide a

5    transcript of a police recording of the conversation. Doc. 25, Part 2.  Plaintiff disputes the

6    transcript but does not describe which parts he thinks are inaccurate. Doc. 34, Plaintiff's

7    Opposition, at 7.  Of note, the transcript quotes Plaintiff admitting to various armed robberies

8    and saying "if the cops try to get me at this point, I don't know, bro, if I'm going to let them take

9    me or not you know what I'm saying cause." Doc. 25, Part 2, June 29, 2004 Transcript, at 4-5.

10   Plaintiff affirmatively asserts that he was not armed at the time. Doc. 34, Plaintiff's Declaration,

11   at 7.  Defendants claim that Plaintiff told Juan Moreno he would commit another armed robbery

12   that night. Doc. 25, Part 4, Hart Declaration, at 2:25:28.  A car arrived; Plaintiff got into the

13   passenger seat; and the car drove off.  Defendants decided to arrest Plaintiff.  They tried to

14   execute a traffic stop, but the car would not pull over.  After a chase, Plaintiff exited the car and

15   ran into a residential backyard.  He evaded arrest by fleeing/hiding in various yards.  In the end,

16   Police Defendants entered the yard Plaintiff was in.  Police Defendants claim to have announced

17   both their entry and use of a police dog just before entering the yard, giving Plaintiff a chance to

18   surrender. Doc. 25, Part 4, Hart Declaration, at 4:15-21.  Plaintiff claims that no such verbal

19   warning was given. Doc. 34, Plaintiff's Declaration, at 8.

20         Of the events in the yard, Plaintiff states:

21              11) When Defendant Officers Robert Hart and Carlos Ramirez confronted me,
             both my hands were empty.
22              12) I was told by officers to put my hands up and show the officers my hands.
             13) At the time my hands were at my sides.
23

24   _____

25         [6]Plaintiff also provides a list of alleged contradictions in the discovery provided by
     Defendants. Doc. 34, Plaintiff's Opposition, at 3-6.  However, he has not provided the underlying
26   documents, and they have not been otherwise filed in the docket for the case.  Without any
     context, the court is unsure as to the significance of these allegations.  However, as Plaintiff's
27   declaration raises sufficient disputed facts to defeat summary judgment on this cause of action,
     the court need no address the alleged contradictions.

28                                              19

14) To comply with orders to show my hands I raised my hands.
15) I never at any time stopped moving my hands at my waistband.
16) I never at any time made a movement towards my waistline.
17) I never at any time tucked my hand inside my waistband.
18) While complying with orders to show my hands I was shot by Defendant Officer Robert Hart.

Doc. 34, Plaintiff's Declaration at 8.  In contrast, Defendant Hart states:

21...I saw Mr. Bradford standing near the fence at the front end of the backyard. It appeared that he was preparing to jump over the fence into the next yard.
22. Mr. Bradford looked at me, and, at that moment, I could see both of his hands, which were empty. Rather than either jump the fence or surrender, he stood looking at me. Then, after a momentary delay, he brought one of his hands to his waistband in a motion which appeared to be a reach for a handgun.
23. I ordered him to show me his hands, and he stopped moving with his hand at his waistband, and stood staring at me.
24. I repeated the order to show me his hands, and he did not comply. Based upon the way in which Mr. Bradford was looking at me, and because I thought that he was about to draw a weapon from his waistband, instead of complying with my order to show his hands, I told him 'don't do it' a couple of times. Mr. Bradford then suddenly moved the hand that was at his waistband, and, believing that he was in the act of drawing to fire on me, I fired my handgun at him twice.

Doc. 25, Part 4, Hart Declaration at 5:3-15.  This largely accords with Defendant C. Ramirez's account:

19. I looked in that direction and saw Mr. Bradford standing near the front fence near the corner of the yard. Mr. Bradford was turned toward Officer Hart, and , after staring at Hart for a time, he brought one of his hands to his waistband in a motion which appeared to be a reach for a handgun.
20. Officer Hart ordered him to show me his hands, and he stopped moving with his hand at his waistband, and stood staring at Hart. I had moved toward Officer Hart's position, and I began to repeatedly order him to show me his hands and get onto the ground.
21. Mr. Bradford continued to stare at Officer Hart and me, and did not comply with the commands which either of us was giving. I heard an officer (I'm not sure who it was) tell Bradford 'don't do it' a couple of times, and Mr. Bradford then suddenly moved the hand that was at his waistband. At that moment, I heard gunshots, and believing that Bradford was firing on Hart and me, I fired my rifle at him in a short burst.

Doc. 25, Part 4, C. Ramirez Declaration, at 15:3-13.  Defendant D. Ramirez was in a different part of the yard and does not claim to have seen whether Plaintiff moved his hands.

The accounts agree on several points.  First, Plaintiff was not trying to flee during the confrontation.  Second, he had nothing in his hands.  Plaintiff states that he was "not armed at

any time during the incident giving rise to this action." Doc. 34, Plaintiff's Declaration, at 7.
Defendants make no claim that Plaintiff was actually armed.  Third, he was ordered to show his
hands.  Defendants Hart and Carlos Ramirez claim that Plaintiff did not comply with the order
and instead reached toward his waistband.  Plaintiff claims he complied by raising his hands and
making no movement toward his waistband.  Defendants characterize the situation as one in
which Plaintiff "failed to comply with numerous commands to surrender made at gunpoint."
Doc. 25, Defendants's Brief, at 20:20-21.  Plaintiff asserts that he was complying with police
orders to surrender.  Whether Plaintiff reached toward his waistband (or appeared to reach
toward it) is a disputed fact.

**2. Constitutional Violation**

Defendants argue that this situation is like that of <u>Forrett v. Richardson</u>, 112 F.3d 416
(9th Cir. 1997), in which the Ninth Circuit affirmed a district court's grant of judgment for
defendants notwithstanding the jury's verdict in favor of plaintiff.  However, that opinion was
mainly concerned with "whether the use of deadly force was necessary to prevent Forrett from
escaping" as the court found,

> Forrett used every desperate means at his disposal to elude capture for almost an hour of
> hot pursuit. He vaulted fences, hid in a shed, and removed easily identifiable clothing. He
> ignored the defendants' repeated shouts. He ran to the fence while the defendants fired
> more than eight shots at him. Despite the volley of bullets, he did not surrender and
> instead began climbing the fence. The defendants fired several more shots at him, and
> still he kept fleeing. The only objectively reasonable conclusion to be drawn from this
> evidence is that if the defendants had not shot him, he would have continued taking
> whatever measures were necessary to avoid capture.

<u>Forrett v. Richardson</u>, 112 F.3d 416, 420-21 (9th Cir. 1997).  The situation in <u>Forrett</u> is factually
distinct.  While both cases involve pursuit of suspect through backyards, Plaintiff was not trying
to flee when finally confronted face to face by the police.  <u>Forrett</u> is a direct application of U.S.
Supreme Court precedent, which described one circumstance under which the use of deadly force
is permissible:

Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

Tennessee v. Garner, 471 U.S. 1, 11-12 (1985).[7]  In Forrett, the Ninth Circuit established that Forrett had committed a violent crime, was still dangerous, and was actively fleeing when the police shot him.  In this case, Defendants can establish that Plaintiff had likely committed violent crimes, was dangerous as he may have been armed, and had been fleeing the police.  When finally confronted by Defendants face to face, though, Plaintiff did not try to escape.  The key danger Defendants faced in this case was the possibility that Plaintiff would shoot at the arresting officers with a hidden weapon.

The analysis contained in a case from the Central District of California, which shares similarities to the case at hand, is useful for reference:

On July 12, 1999, the SIS officers were assigned to begin a surveillance operation of Oswaldo Arevalo, a male Hispanic. The SIS officers were told that Arevalo and another Hispanic male were suspected of committing a series of armed robberies. In particular, the individuals were suspected of committing 'take over' style robberies of travel agencies, robbing employees of blank airline tickets.

On the morning of August 14, 1999, surveillance began at Arevalo's residence, 19400 Hatton Street. Detectives Callian and Avila observed Arevalo drive to a gas station in a gray 1991 Lincoln Continental and purchase gas, then return to the residence.

Later that morning, Arevalo and Manuel Echevarrio left the house and entered a purple 1996 Toyota RAV-4. Decedents, Jose Figueroa and Mario Guerrero, also left the house and entered the Lincoln. Detectives Gizzi and Spelman followed Arevalo and Echeverria in a Toyota to a parking lot at 17050 Chatsworth Street. Arevalo exited the Toyota and walked toward the building. Figueroa and Guerrero parked nearby. Arevalo apparently exited the building and met with Figueroa and Guerrero. Echevarria then picked Arevalo up and drove away from the building. Figueroa and Guerrero exited the Lincoln and entered the building, leaving 10 or 15 minutes later with a plastic trash bag. They

---

[7]Recent precedent has clarified the analytical approach to deadly force: "there is no special Fourth Amendment standard for unconstitutional deadly force. Instead, 'all that matters is whether [the police officer's] actions were reasonable.'" Acosta v. Hill, 504 F.3d 1323, 1324 (9th Cir. 2007), quoting Scott v. Harris, 127 S. Ct. 1769, 1777-78 (2007).  Thus, contrary to older caselaw, Garner does not describe the exclusive circumstances under which deadly force is justified.  However, the substance of the prior case law based on Garner remains instructive.

reentered the Lincoln and drove away.

The officers continued to trail the two vehicles. They received a radio transmission that a robbery had occurred at 17050 Chatsworth Street and the suspects were armed with guns.

As he followed the Lincoln, Detective Davis, one of the members of the surveillance team, observed Guerrero, the passenger, 'moving about the front passenger seat..."doing something weird."' He states in his declaration that he observed Guerrero 'to be removing or putting something on and then climbing over the front seat to the rear seat.'

When the Lincoln reached the Hatton Street residence, Detectives Gizzi and Spelman parked directly behind it. Detective Gizzi identified himself as a police officer and ordered Figueroa and Guerrero to raise their hands. Detective Gizzi observed Guerrero rise from the back seat and turn toward the officers. Detective Spelman saw Guerrero raise his hand, holding a dark object, which Detective Spelman states in his declaration appeared to be a handgun.

'Suddenly, Detective Spelman shouted "Gun."' Detective Spelman fired one round. After Detective Rodriguez observed Guerrero turn his head toward the officers, he fired two rounds at Guerrero. Guerrero climbed into the front seat, then out of the front passenger window, landing on the pavement. He rose to his knees, facing away from the officers, 'with both hands concealed at his front waistband.' Detective Gizzi again identified himself as a police officer and ordered Guerrero to raise his hands. Guerrero did not comply, but he turned his head toward the officers, with his hands in front of his body.

Meanwhile, Detective Rodriguez observed Figueroa exiting the vehicle, facing toward Detectives Spelman and Gizzi. Figueroa lifted his shirt and reached into his front waistband. Detective Rodriguez fired one shot at him, as did Detective Spelman. Figueroa dropped to his knees and crawled toward the front of the car. Detective Rodriguez ordered him to raise his hands and move away from the vehicle.

Detective Gizzi shot Guerrero. Detective Winston fired two rounds at Figueroa. Both men were killed, having been shot in the back. Both were unarmed. There was an unloaded gun and ammunition in the car.

Figueroa v. Gates, 207 F. Supp. 2d 1085, 1087-89 (C.D. Cal. 2002).  In denying qualified

immunity, the court found,

The officers never saw decedents with weapons. However, they were advised via radio transmissions that the two suspects in the robbery were armed with guns. Decedents were parked in a driveway, 11 blocked in by police cars. Detective Spelman asserts that he saw Guerrero raise his hand and point a dark object at the officers, which Spelman believed to be a gun. The officers demanded that decedents put their hands up, but decedents faced away from the officers with their hands concealed in their waistbands. Decedents were shot in the back. The officers found an unloaded gun and ammunition in the car....

This case bears none of the hallmarks of the cases in which the Ninth Circuit and other courts have found excessive force defendants to be entitled to qualified immunity. Decedents never brandished their (unloaded) weapon, much less used it. Decedents did not flee. Decedents did not actively resist arrest.

Figueroa v. Gates, 207 F. Supp. 2d 1085, 1092 (C.D. Cal. 2002), citations omitted.  Of note, the Central District found it undisputed (likely due to the fact that the defendant police officers were the only surviving witnesses) that Guerrero and Figueroa were reaching for their waistbands when they were shot.  On the other hand, Guerrero and Figueroa had not actively fled the police before being confronted.

   In one case cited by Figueroa concerning suspects who did flee the police, the Fifth Circuit reversed a district court's denial of qualified immunity:

> we must conclude that Anderson's shooting of Crawford was reasonable and not excessive. As described in Anderson's affidavit, the vehicle in which Crawford was sitting had just come to an abrupt stop after a high speed chase during which apparently-stolen objects had been tossed from the car. Anderson had his gun drawn and pointed at Crawford and the driver. Anderson ordered the vehicle's occupants to raise their hands. Clear communication was difficult because of the siren noise, a situation for which Anderson is not to blame; nonetheless, the vehicle occupants clearly understood Anderson's commands and initially complied. Then Crawford repeatedly reached down in defiance of Anderson's orders. At least twice, Crawford reached below Anderson's sight line. The second time, Crawford tipped his shoulder and reached further down.
>
> Under these circumstances, a reasonable officer could well fear for his safety and that of others nearby. He could reasonably believe that Crawford had retrieved a gun and was about to shoot. That is, an officer would have probable cause to believe that the 'suspect pose[d] a threat of serious physical harm.' Anderson had repeatedly warned Crawford to raise his hands and was now faced with a situation in which another warning could (it appeared at the time) cost the life of Anderson or another officer. Under such circumstances, an officer is justified in using deadly force to defend himself and others around him. Accordingly, the individual defendants are entitled to summary judgment as a matter of law.
>
> The fact that the vehicle was 'totally surrounded' by police does not change matters; had Crawford in fact retrieved a gun from beneath his seat, he could have caused injury or death despite the presence of numerous police officers. Also irrelevant is the fact that Crawford was actually unarmed. Anderson did not and could not have known this. The sad truth is that Crawford's actions alone could cause a reasonable officer to fear imminent and serious physical harm.

Reese v. Anderson, 926 F.2d 494, 500-501 (5th Cir. Tex. 1991), citations omitted.  The present case is very similar to Reese under Defendant Hart's and C. Ramirez's accounts of events.  The suspect evaded arrest and was finally cornered.   However, the Fifth Circuit's opinion is based on the fact that,

> Reese's response to the defendants' summary judgment motion is sorely lacking. Reese

24

submitted one piece of summary judgment evidence, an affidavit from a (non-passenger) eyewitness to the shooting. The substantive portion of the affidavit is as follows:

'The car that Mr. Crawford was riding in was totally surrounded by Waco Police Officers when Officer Anderson shot Mr. Crawford. Mr. Crawford did not pose a threat to Officer Anderson's life or to any of the other officers surrounding the car.'

This affidavit amounts to virtually nothing. The first sentence, although factual, does not raise a genuine issue of material fact. Even assuming that Crawford's vehicle was totally surrounded, he could certainly have posed a threat to an officer's life were he permitted to retrieve and fire a concealed weapon. In other words, a reasonable jury, presented only with this evidence in Reese's favor, could not return a verdict in her favor....

Nor is this a case where the difficulty of presenting competent evidence is manifest. On the contrary, when the decedent was shot, he was sitting in a car with three other occupants, one of whom was his own brother.

Reese v. Anderson, 926 F.2d 494, 499 (5th Cir. Tex. 1991).

Plaintiff has provided a declaration that is sufficiently specific as to the key events surrounding the shootings.  He denies making any motion towards his waistband, the key factor which justified the use of force in Reese.  Given the disputed facts, the court can not determine as a matter of law that Defendants did not use excessive force in violation of the Fourth Amendment.

**3. Qualified Immunity**

Qualified immunity protects "government officials...from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The analysis involves two steps: whether the officers' conduct violated a constitutional right and whether the right was clearly established. Saucier v. Katz, 533 U.S. 194, 201 (2001).  Clearly established must be understood "in light of the specific context of the case, not as a broad general proposition" and means that "the contours of the right were sufficiently clear that a reasonable official would understand that what he is doing violates the right." Saucier v. Katz, 533 U.S. 194, 201-202 (2001).  "The determination of whether a reasonable officer could have believed his conduct was lawful is a determination of law that can be decided on summary judgment only if

the material facts are undisputed. If, however, there is a material dispute as to the facts regarding what the officer or the plaintiff actually did, the case must proceed to trial, before a jury if requested." LaLonde v. County of Riverside, 204 F.3d 947, 953 (9th Cir. Cal. 2000), citations omitted.

In this motion, given the summary judgment standards, the court can not rule out a constitutional violation. The key fact in dispute is whether Plaintiff reached toward his waistband.  The case law in Reese makes it clear that when a suspect who has fled arrest is cornered but does not reach toward a place where a weapon might be hidden, shooting that suspect is a constitutional violation.  The particularized contours of the law were clear.  Qualified immunity can not be granted at this stage.[8]

**D. Municipal Liability**

To establish municipal liability based on official policy or custom, Plaintiff must show that  (1) a city or county employee committed the alleged constitutional violation under a formal governmental policy or longstanding practice or custom that is the customary operating procedure of the local government entity; (2) the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself was an act of official governmental policy which was the result of a deliberate choice made among various alternatives; or (3) an official with final policy-making authority either delegated policy-making authority to a subordinate or ratified a subordinate's unconstitutional decision or action and the basis for it. Monell v. Dept of Soc. Servs., 436 U.S. 658, 691 (1978); Gillette v. Delmore, 979 F.2d 1342, 1346-47 (9th Cir. 1992).  In the complaint, Plaintiff alleges a 42 U.S.C. §1983 cause of action against Defendant City of Modesto,

> 42. Prior to June 29, 2004, Defendant, City of Modesto, developed and
> maintained policies or customs exhibiting deliberate indifference to the constitutional

---

[8]In briefing, Defendants do not distinguish between the positions of the Police Defendants in considering qualified immunity.  The court declines to undergo that analysis in the absence of briefing from either side.

rights of persons in Modesto, which caused the violation of Plaintiff's rights.

43. It was the policy and/or custom of Defendant, City of Modesto, to inadequately and improperly investigate citizen complaints of police misconduct, and acts of misconduct were instead tolerated by Defendant, City of Modesto.

44. It was the policy and/or custom of Defendant, City of Modesto, to inadequately supervise and train its police officers, including Defendants, Officer Dave Ramirez, Officer Carlos Ramirez, and Officer Robert Hart, and Does 26 and 50, thereby failing to adequately discourage further constitutional violations on the part of its police officers. Defendant, City of Modesto, did not require appropriate in-service training or re-training of its police officers who were known to have engaged in police misconduct.

45. As a result of the above described policies and customs, police officers of Defendant, City of Modesto, including Officer Dave Ramirez, Officer Carlos Ramirez, and Officer Robert Hart, and Does 26 through 50, believed that their actions would not be properly monitored by supervisory officers and that misconduct would not be investigated or sanctioned, but would be tolerated.

Doc. 2, Part 2, Complaint, at 11:1-22. Plaintiff alleges inadequate investigation of complaints and inadequate supervision/training of police officers by Defendant Modesto.

As part of this summary judgment motion, Plaintiff has made no argument concerning Monell liability. He has only provided copies of Defendants' responses to Plaintiff's interrogatories. One of Plaintiff's questions was "On how many occasions since 1999 has an investigation with regard to a police officer involved shooting concluded that the shooting was outside of or in violation of policy?" Defendant Modesto answered, "the Modesto Police Department maintains written records regarding the review of line-of-duty shooting incidents which extend back for a period of five years. The extant records reflect that no incident within that time period was found to have been outside of or in violation of departmental policy." Doc. 34, Ex. E, at 3:15-18. Defendant Hart states that the present incident is the only occasion on which he has been investigated for either use of deadly force or discharge of a firearm. Doc. 34, Hart Answer, at 20-21. Defendant C. Ramirez states that he has been investigated for discharge of firearm and use of deadly force on two other occasions. Doc. 34, C. Ramirez Answer, at 28-29. Defendant D. Ramirez states that the present incident is the only occasion on which he has been investigated for use of deadly force and that he has been investigated on one other occasion for discharge of firearm involving a dog attack. Doc. 34, D. Ramirez Answer, at 36-37. Plaintiff provides no evidence regarding handling of citizen complaints, training, or supervision. Defendants have provided the declaration of the Chief of the Modesto Police Department. Chief

Wasden states that the Modesto Police Department complies the California Commission on Peace Officer Standards and Training (P.O.S,T,), is accredited by the Commission on Accreditation of Law Enforcement Agencies (CALEA), and investigates complaints in compliance with California Penal Code §832.5. Doc. 25, Part 4, Wasden Declaration, at 16:14-17:26.

Defendants do not provide much evidence, but it is sufficient to meet its burden of production for summary judgment. The ultimate burden of proof is on Plaintiff. Essentially, Plaintiff stands on the allegations contained in his complaint. Defendants' bare interrogatory answers do not create a triable issue of fact; no reasonable inference can be drawn that would show inadequate training, supervision, or complaint processing. Taking just the inadequate training issue, Plaintiff must provide some evidence to show that the training caused the constitutional violation and that Defendant Modesto made a conscious choice in being deliberately indifferent to Plaintiff's rights. See Santos v. City of Culver City, 228 Fed. Appx. 655, 659 (9th Cir. 2007); Price v. Sery, 513 F.3d 962, 973 (9th Cir. 2008); City of Canton v. Harris, 489 U.S. 378, 388 (1989).

## V. Order

Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

Summary adjudication in favor of all Defendants on the first, second, third, fourth, fifth, sixth, seventh, tenth, and eleventh causes of action is GRANTED.

Summary adjudication on the excessive force claim (eighth and ninth causes of action) against Defendants Hart, Carlos Ramirez, and David Ramirez is DENIED.

The matter is referred to Magistrate Judge Gary Austin for a scheduling conference.

IT IS SO ORDERED.

**Dated:    October 2, 2008**                    **/s/ Anthony W. Ishii**
                                        CHIEF UNITED STATES DISTRICT JUDGE